# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

DENNIS K. KIEREN, JR.,

    *Petitioner*,

vs.

STATE OF NEVADA ATTORNEY
GENERAL , *et al.*,

    *Respondents*.

3:07-cv-00341-LRH-WGC

ORDER

This habeas matter under 28 U.S.C. § 2254 comes before the Court for a decision on the merits of the remaining claims.  The Court reaches only Ground 5 of the amended petition, which alleges that petitioner was denied due process of law because the jury instructions failed to correctly instruct the jury as to the elements required for a conviction for first degree murder under Nevada law.

### *Background*

Petitioner Dennis Kieren seeks to set aside his 1999 Nevada state conviction, pursuant to a jury verdict, of first degree murder with the use of a deadly weapon.  He is serving two consecutive life sentences without the possibility of parole.

Kieren was convicted of the March 7, 1996, murder of David Allan Broyles.  It was undisputed that Kieren shot Broyles multiple times with a 9 mm semiautomatic handgun.  The factual dispute at trial focused upon the circumstances leading up to the shooting and Kieren's state of mind at the time of the shooting.  The State and the defense presented markedly different evidence as to what occurred.  The jury instructions at issue went to the heart of the dispute as to intent, under either account of the event.  The question at trial was not whether Kieren killed Broyles but instead was his state of mind at

1   the critical time, which bore not only on his defense of self-defense but also upon, among other things,

2   the issue of whether he was guilty of second degree murder rather than first degree murder.[1]

3        Dennis Kieren had known David Broyles and Michael Woods, separately, for approximately

4   three years prior to the incident.  Kieren had interacted socially and professionally with Broyles and

5   Woods, again separately, in one fashion or another over this time.  Broyles and Woods also had known

6   each other for about four years, but each did not know that the other also knew Kieren.  Woods and

7   Kieren each had some background, to one extent or another, in fugitive retrieval ("bounty hunting")

8   and/or armed security work.[2]

9        At the relevant time, Broyles was renting from Kieren and staying at his house.  In or around

10  December 1995, Woods returned to Las Vegas from out of state.  Woods contacted Kieren, although

11  they had had a falling out a year or so prior to that over money that Kieren allegedly owed Woods.  They

12  arranged for Woods to also rent space in Kieren's house, with Woods sleeping on Kieren's sofa.[3]

13       As of the first part of March 1996, Broyles was planning to move out or was in the process of

14  moving out of Kieren's place.  However, as of the date of the incident he was not fully moved out.

15  There was friction at that time over money between Kieren and Woods; and there was friction

16  separately between Kieren and Broyles, for one reason or another.[4]

17       On the evening of March 6, 1996, Woods and Broyles, who had been working together on a

18  painting job, were in and out of Kieren's house.  Kieren was there. Woods and Broyles eventually

19  _____

20       [1]The following summary in the text is intended only as an overview of the basic factual particulars of the case
21  in order to provide context for the discussion of the issues.  Any lack of mention of specific evidence in this overview
    does not signify that the Court has overlooked or ignored that evidence in considering a particular issue.

22       The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or
23  statements of fact in the state court.  The Court summarizes same solely as background to the issues presented in this
    case.  No statement of fact made in describing statements, testimony or other evidence in the state court, whether in this
24  overview or in the discussion of a particular issue, constitutes a finding by this Court.

25       [2]#22, Ex. 12, at 150-59 & 189-93 (Woods); id., Ex. 13, at 241-44 & 277-78 (Kieren).

26       [3]#22, Ex. 12, at 153-56 (Woods); id., Ex. 13, at 241-45 (Kieren).

27       [4]#22, Ex. 12, at 156-57, 165-67, 190-95 & 204-05 (Woods); id., Ex. 13, at 242-45 & 291 (Kieren).  Woods
28  testified that he also was still living at Kieren's house but also was in the process of moving out.  Kieren maintained that
    Woods no longer was living at his house by that time.  The distinction is not critical to resolution of the case.

1   picked up Kristi Telles, who was dating Broyles, after she got off work and headed back to Kieren's
2   house.[5]

3          After returning to Kieren's house, Woods, Broyles, and Telles sat around in the garage with the
4   garage outer door closed or nearly fully closed, drinking and also smoking some marijuana.[6]

5          Kieren came into the garage from the house a number of times.  He was having words with
6   Broyles about one household complaint or another, such as the three allegedly drinking all of his beer,
7   eating all of his pizza, and not cleaning up after themselves.  He would complain about one thing or
8   another and then go back into the house.[7]

9          At some point, Broyles slipped away into the house without Michael Woods noticing.  Woods
10  testified that he "heard something sound like a thump" and noticed that Broyles was no longer in the
11  garage.[8]

12         Woods went into the house looking for Broyles, either with Telles or followed shortly thereafter
13  by Telles.  Inside, the only lights showing were the aquarium lights and the light coming from
14  underneath Kieren's closed master bedroom door.  Woods listened through the door but could not hear
15  anything.  Woods knocked but got no response.  Woods grabbed the door knob to enter.  When Woods
16  was at the door and before he did anything further, Telles went back to the garage.[9]

17         When Woods opened the bedroom door, he saw the closet sliding doors laying on the floor with
18  glass and blood on the carpet.  A trail of blood led into the bathroom.  When Woods entered the
19  bathroom, he saw Broyles standing over the clothed Kieren in the empty tub.  According to Woods'
20  testimony, the left-handed Broyles was holding Kieren's ponytail with his right hand and had his left
21  hand over the top of the blade of a knife which was in Kieren's hand.  Kieren kept the knife on the

22

23          [5]#22, Ex. 12 at 158-63 (Woods); *id.*, Ex. 13, at 245-50 (Kieren); #21, Ex. 11, at 99-103 (Telles).

24          [6]#22, Ex. 12, at 163-64, 192-93 & 205-06 (Woods); *id.*, Ex. 13, at 246-47 & 249-50 (Kieren); #21, Ex. 11, at
25  103-05 & 112-13 (Telles).

26          [7]#22, Ex. 12, at 164-65 & 197-99 (Woods); *id.*, Ex. 13, at 250-55 (Kieren); #21, Ex. 11, at 104 & 113(Telles).

27          [8]#22, Ex. 12, at 167-68 & 198-99 (Woods); #21, Ex. 11, at 105 (Telles).

28          [9]#22, Ex. 12, at 168-70 & 199-200 (Woods); #21, Ex. 11, at 106-07 & 114-15 (Telles).

1   window ledge in the shower.  Although Woods maintained that Kieren's hand was on the handle of the

2   knife, he testified that Broyles had the knife pushed up against the left side of Kieren's face, with his

3   hand over the top of the knife.  Broyles further had his head up against the left side of Kieren's face.[10]

4        Notwithstanding his testimony that it was Kieren's hand on the handle of the knife, Woods

5   testified that he went up to Broyles and said: "David, what the f___ are you doing?"  Woods

6   acknowledged on cross-examination that he stated to the police in his initial written statement that he

7   thought Broyles was going to kill Kieren when he first saw them in the bathroom.[11]

8        Broyles then bit Kieren's ear off, pulled it off, and spit it out in the tub.  Kieren let go of the

9   knife, and Broyles took full control of the knife.[12]

10       Woods testified that Broyles then said to him: "Get the f___ away from me, I will stab you

11  too."[13]

12       Woods tried to calm Broyles down, defuse the situation, and get the knife from him.  According

13  to Woods, Broyles stated that Woods did not understand, that Kieren had been going for his gun, and

14  that "[n]obody is leaving here alive."  He would not let go of the knife, saying that "no, he was going

15  to kill me."  Woods ultimately was able to get the knife from Broyles, with Broyles asking Woods to

16  hold Kieren down and give him a couple of minutes to get out of the house.  Woods took hold of

17  Kieren's ponytail in place of Broyles, and Broyles released the knife to him.  Broyles then left the

18  bathroom, and Woods heard the bedroom door close behind him.[14]

19       According to Kieren's testimony, the events that occurred in his room up to that point, including

20  those that occurred prior to Woods arriving, transpired as follows.

21       According to Kieren, Broyles came into his room, and the two had a tense verbal exchange.

22  Broyles then grabbed him by his hair and struck him repeatedly with his drink glass, while kneeing him

23

24       [10]#22, Ex. 12, at 170-72 & 201-03.  See also *id.*, Ex. 13, at 285 (Kieren testimony as to usual location of knife).

25       [11]*Id.*, at 172, 201-02 & 206.

26       [12]*Id.*, at 172-73.

27       [13]*Id.*, at 172.

28       [14]*Id.*, at 173-76.

and calling him a "punk" and a "bitch." Kieren struggled to break free, and the two men crashed through the closet doors. Broyles continued hitting him with the glass three or four more times until the glass started to shatter. Kieren testified that from this point "it is like a strobe light going on and off" and that "I remember bits and pieces of it." The struggle carried on into the bathroom, where Broyles struck Kieren several times in the head with a cologne bottle until the bottle broke, with Kieren recalling that he could smell the cologne after the bottle broke.[15]

According to Kieren, he fell back into the tub, and Broyles continued to attack him, holding him by the hair and calling him names throughout. Kieren was unable to get any leverage to push his way back out of the tub. Broyles told him that he was going to bite his ear off, and then he did so, spitting Kieren's ear back at him. Broyles then reached up and grabbed Kieren's knife from the window ledge and started thumping him on the head with it. Broyles then "took a hold" of Kieren's nose with his mouth, at which point Woods walked in.[16]

According to Kieren, Woods said to Broyles: "What the f___ are you doing?" Broyles responded that he was sick of Kieren's mouth, that he was done with him, and that he was going to kill Kieren. Woods asked for the knife and then tried to grab Broyles' hand. Broyles jerked his hand away and held the knife up against Kieren's throat. Kieren held his hands up to protect himself, and the knife would cut his hand every time that Woods tried to grab it. Similar to Woods' account, Woods ultimately was able to get Broyles to give him the knife, and Broyles asked Woods to hold Kieren down until Broyles left the room. According to Kieren, Broyles leaned down to him, said "now you are going to die," and ran from the room.[17]

According to Woods' testimony, after Broyles left the room, Kieren immediately tried to get out of the tub. Woods told him to stay in the tub. Kieren said: "No, you don't understand, Mike. He bit my f___ in ear off. I am going to kill him." Kieren got up out of the tub. Woods still had the knife that he had obtained from Broyles in his hand. Kieren pushed past him and said: "I am going to kill him.

---

[15]#22, Ex. 13, at 255-57.

[16]*Id.*, at 257-60.

[17]*Id.*, at 261-64, 288-89 & 292.

1  He bit my f___ing ear off." Woods urged Kieren to let the police handle the situation. Kieren went

2  over to his desk, retrieved his Ruger 9mm handgun, chambered a round, and put the gun to Woods'

3  forehead. He told Woods, who still had the knife, to get back.[18]

4          According to Woods, Kieren then exited the bedroom while keeping the gun pointed at him.

5  He then started "sweeping the hall," meaning that he kept the weapon in front of him sweeping the area

6  in "combat mode" from a military stance. He did so while keeping an eye on Woods, who kept pace

7  with him about three to four feet away, with the knife still in his hand. Kieren moved down the hallway,

8  keeping his back to the wall and his weapon in front of him, pointing alternately at Woods and then

9  down the hallway.[19]

10         Woods testified that Kieren swung open the door to Broyles' bedroom and swept the bedroom

11  with his weapon in combat mode. He similarly swept the hall bathroom, the living or dining room, and

12  the kitchen. The dogs were standing at the sliding glass patio door, so it did not appear that anyone had

13  gone that way. Throughout, Kieren would sweep the weapon back to Woods, who still had the knife

14  in his hand.[20]

15         Woods testified that Kieren then headed for the door to the garage, which opened inward into

16  the house. Woods kept pace with him, three to four feet away, with the knife still in his hand, although

17  he maintained at trial that he did not realize at the time that he still was holding the knife. Woods urged

18  Kieren again to let the police handle the situation and "don't do this." Kieren then swung the door open

19  with his left hand while holding the gun in his right.[21]

20         According to Woods' testimony, Broyles was standing in the garage reaching for the switch that

21  opened the garage outer door. Kieren raised his weapon, and Broyles stepped back with his arms raised

22  above his head saying "no, don't shoot . . . ." Kieren then fired, with the shots being "real rapid."

23  Woods believed that the first shot hit Broyles in the shoulder, turning him. Another shot hit him in the

24

25         [18]#22, Ex. 12, at 176- 77.

26         [19]*Id.*, at 177-80.

27         [20]*Id.,* at 178-80.

28         [21]*Id.,* at 179-80.

1    hip, and he started going down, with the door from the house to the garage swinging shut at the same

2    time.  According to Woods, who was inside the house, he was able to tell that Broyles was going to the

3    ground because Kieren's shots were following him to the ground as he kept firing.  Kieren kept firing

4    until the door swung closed to about an inch from being fully shut.[22]

5         Woods testified that Kieren then spun toward him, pointing the gun directly at him again.

6    Kieren then flipped the door open again.  Broyles was laying face down on the concrete, with his head

7    laying on the threshold.  Woods continued:

8              And David was laying down there.  He spun down, put the gun
               down towards him point blank and pulling the trigger.  He shot him four
9              or five times.

10   According to Woods, Kieren went "pow, pow, pow, pow, pow like that" and then turned around and

11   pointed the gun at him again.  Woods just stood there.  Kieren walked around Woods into the kitchen

12   with the gun pointed on him and called 911.[23]

13        According to Kristi Telles' testimony, Broyles came back to the garage covered in blood but

14   with no injuries that were apparent to her on that quick view.  He said to her: "Get your stuff.  Let's

15   get out of here."  Kieren of course was inside the house at the time of any such statement.  Telles

16   testified that Kieren opened the inside garage door, came into the garage, pointed the gun at them, "and

17   just started firing."  Broyles was standing "just a couple of feet" from the door.  The outer garage door

18   was closed.  Telles testified that Broyles said "no, don't" before Kieren fired.  According to Telles,

19   Broyles fell to the ground, Kieren stood there and stared at him "for about a second," and he "then

20   started firing again at him when he was laying down on the ground."  Telles ran across the garage trying

21   to get away from the line of fire.  She testified that "I guess when he ran out of bullets," Kieren stood

22   there staring at Broyles.  Michael Woods then entered the garage.[24]

23        According to Kieren's testimony, after Broyles left the master bedroom, he tried to get out of

24   the tub a couple of times but Woods slammed him back down each time.  Woods was telling him that

25   _____

26        [22]#22, Ex. 12, at 180-82.

27        [23]*Id.*, at 182-83.

28        [24]#21, Ex. 11, at 108-111, 113-15 & 117-18.

-7-

1   he needed to let Broyles cool down and that if he got up he "would end up dead."  Kieren was scared.

2   He did not want to be caught in the tub, because he believed that Broyles would come back.  He had

3   heard the home's alarm system beep when Broyles had gone out through the door leading into the

4   garage.[25]

5          Kieren testified that he ultimately was able to get up, and he then "took off running" and grabbed

6   his handgun.  He could hear things being moved in the garage "like the weights," and he knew that

7   Broyles kept some camping gear out there.  He assumed that Broyles was going through that gear.  At

8   that point, Woods was standing behind Kieren with the knife.  Kieren turned and looked at him, and he

9   then took off running.  He stated that "I was trying to get distance between" Woods and Broyles.  Kieren

10  ran to the garage.[26]

11         According to Kieren, when he opened the inside garage door, Broyles was by his weight bench

12  digging in his denim jacket and a bag.  Kieren stepped into the garage onto the step between the house

13  and garage.  Broyles looked up, said "what's up? You want some more?," and started running at him.

14  Broyles was starting to pull something black out of a jacket or a shirt.  Kieren knew that Broyles kept

15  several hunting knives in the garage, and he believed that Broyles was pulling a knife "or something."

16  He felt like he was in danger.  According to Kieren, Kristi Telles was saying to Broyles: "David, David,

17  don't do it."[27]

18         Kieren testified that he "just started back peddling and shooting."  He testified that he shot until

19  the door closed, shooting "one through the door or something."  He stated that "I could have swore it

20  was like three or four" shots.  Kieren maintained that one of the bullets "spun him around like a circle

21  and then I kept firing until the door closed."  According to Kieren, he did not see Broyles hit the ground.

22  When either Kieren or Woods opened the door again, Broyles was laying on the floor with his head

23  "real close to the door."  #22, Ex. 13, at 271-74 & 289.

24         ////

25  ─────────────────────

26         [25]#22, Ex. 13, at 264-66 & 285.

27         [26]*Id.*, at 266-69 & 286-87.

28         [27]*Id.*, at 267-72.

1    According to Kieren, Woods was saying to him: "What the f___ did you just do?"  Woods

2  pushed by him out into the garage.  Kieren went to the kitchen and called 911.[28]

3    According to Woods' testimony, after the shooting, when he went into the garage, he told Telles:

4  "Get the f___ out of the house.  No one is leaving here alive."  She just stood there.  He hit the door

5  switch to the outer garage door "because I couldn't understand why the garage door was still down."

6  Telles still was standing there as the door started going up, perhaps in shock, and he told her again: "Get

7  the f___ out of here now."  Telles then turned and ran out of the garage.  According to Woods, Kieren

8  pointed the gun at Telles as she was going out under the door.  Woods turned around to face Kieren,

9  with the knife still in his hand, and Kieren stepped back and pointed the gun at him.[29]

10    Telles testified that she ran next door after Woods told her to leave and opened the garage door.

11  According to her testimony, she saw Kieren going in and out of the house as she was running.  She rang

12  the neighbor's doorbell frantically.  When a woman answered, she told her what happened and asked

13  her to call 911.  She stayed at the house thereafter.  She had been grazed by a bullet on her left leg.[30]

14    Woods testified that after Telles left and Kieren had the gun pointed at him, he then pointed it

15  down at Broyles again.  Woods thought that Kieren was going to shoot Broyles again.  Kieren was

16  saying something on the phone about it being self defense.  Woods, who still had the knife in his hand,

17  said "you lying son-of-a-bitch" and shoved Kieren hard back towards the kitchen.  They shoved back

18  and forth, with Kieren saying that it was self defense and Woods saying "you didn't have to shoot David

19  like that, you son of a bitch."[31]

20    Although it would have seemed from Woods' testimony that the above exchange occurred in

21  the garage, Woods testified that he then opened the door, stepped back out into the garage, and grabbed

22

_____

23    [28]#22, Ex. 13, at 272-74.

24    [29]#22, Ex. 12, at 183-84.

25    [30]#21, Ex. 11, at 111-12.  The neighbor, Patricia Barbieri, testified that she "heard a couple of pops," "[k]ind of
like a cap gun," but she was not sure what it was.  Less than a minute later, a young woman was pounding on her door.
26  When she answered the door, the young woman said "he shot him, he shot him" and asked her to call the police.  The
young woman thereafter cowered in her hallway, "on the floor curled in a ball."  She kept repeating: "He shot him.  He
27  shot him."  She said that the "he" was "Dennis."  #21, Ex. 10, at 56-60.

28    [31]#22, Ex. 12, at 184-85.

1   Broyles and turned him over.  Broyles was so close to the door that when the inside garage door kept

2   closing back, it would strike Broyles in the head.[32]

3          Woods testified that it was at this point that he realized that he still had the knife in his hand,

4   and he threw it to the other side of the garage.[33]

5          After rolling Broyles over, Woods attempted CPR, but there did not appear to be much that

6   Woods could do for him.  According to Woods, Broyles "gasped for air and turned his head and gasped

7   again."  Kieren looked out again and pointed the weapon at Woods' head and then at Broyles again.

8   Woods grabbed Broyles by the hand and pleaded with him "please, don't die David," stating: "You are

9   not going to die in this f___ing pig's house."[34]

10         Woods then dragged Broyles out of the garage – away from the scene of the shooting – out onto

11  the driveway.[35]

12         James Hawes lived three houses west of Kieren's house.  He was getting his mail from his box

13  in the neighborhood's cluster mailboxes a couple of homes away from Kieren's house when he heard

14  three gunshots.  He testified that one of the shots "whizzed" by his ear.  He jumped to the ground, then

15  ran to his house to get his cell phone, and then called 911 while standing behind his jeep.  He looked

16  toward Kieren's house, as he believed that he had heard the sound of the shots come from there.  By

17  this point, the garage door was open, and a man was standing over a body laying in the garage.  Hawes

18  had seen a figure run from the house before that.  Hawes then saw Kieren come to the inside garage

19  door, and the man said: "You hunted him down and shot him like a dog, you mother f___er."  The man

20  then ran toward Kieren and they began fighting in the door frame to the house.  Kieren left and then the

21  man dragged the body out into the street.  Hawes testified that he was thirty yards from the house and

22  that the body was ten feet from the garage door when the body was inside the garage.  He did not see

23  anything on the floor of the garage from his vantage point.   #21, Ex. 10, at 17-27.

24  _____

25         [32]#22, Ex. 12, at 185.

26         [33]*Id.*

27         [34]*Id.*, at 185-86.

28         [35]*Id.*, at 186.

1    Ronald Allen lived "kitty- corner" from Kieren's house.  Allen was awakened by a neighbor

2    knocking on his door and ringing his doorbell.  When he went outside after answering the door, he saw

3    a body laying on the ground with a man who he believed to be called "Mike" holding the body.   The

4    man appeared to be "very scared, agitated, crying," "real nervous," and "shaking."  Allen asked him

5    what happened and he said: "Dennis shot David.  Dennis killed David."  Although Allen responded

6    affirmatively that he was awakened by the knocking neighbor, he also testified that he thought that he

7    heard some shots but he thought that they possibly were coming from a nearby outdoor shooting range.[36]

8    There was no testimony by any of the neighbor witnesses who testified at trial of hearing

9    specifically multiple gunshots followed by a sustained pause and then more multiple gunshots coming

10   from Kieren's house.

11   Forensic examination of the scene and physical evidence reflected the following.

12   Consistent with the testimony as to an extremely violent fight in Kieren's master bedroom, there

13   was apparent human blood throughout the carpet; on top of the papers on the work desk in the office

14   area in the corner; on top of the sliding closet doors that had been knocked down; on the doorway

15   leading into the master bath, as if someone had been bounced into it; smeared over the shower stall, tub

16   area and the window sill; and also on the toilet.[37]

17   Consistent with Kieren's testimony that Broyles hit him repeatedly in the head with a drink glass

18   during the violent struggle, there were shards of broken glass apparently from a drinking glass

19   throughout the master bedroom, even on the bed, intermixed with blood.[38]

20   Consistent with Kieren's testimony that Broyles hit him repeatedly in the head with a cologne

21   bottle, there were shards of glass in the master bath from an apparent cologne or aftershave bottle with

22   apparent blood mixed in, with the detective testifying that the bottle "really broke apart."[39]

23   / / / /

24   

25   [36]#21, Ex. 10, at 27-35.

26   [37]*Id.*, at 77-81 & 87 (Detective Bigham).

27   [38]*Id.*, at 78.

28   [39]*Id.*, at 87.

1    An empty sheath for a knife was found laying on the rug in the master bath.[40]

2    An empty holster with a magazine with a few cartridges for Kieren's 9mm Ruger was found

3    under the sliding closet doors on the floor.[41]

4    Kieren was examined at the trauma center at University Medical Center a short time after the

5    incident.  Examination reflected that the top third of his right ear had been torn or cut off.  He

6    additionally had multiple lacerations on his forehead and scalp, and he had superficial lacerations on

7    his hands from a sharp instrument.  The trauma center physician could not provide an opinion at the

8    time of trial -- relying upon his notes rather than an independent recollection of the examination – as

9    to whether, or not, these injuries were consistent with Kieren having been hit on the head with both a

10   drinking glass and a cologne bottle that shattered and attempting to shield himself from having a knife

11   held up against him.[42]

12   In Broyles' bedroom, there was blood on the door entering the room.  The police found a gun

13   box for a .45 caliber Para-Ordnance semiautomatic handgun, without the gun, laying open on the futon,

14   with a few spatterings of apparent blood on the box, as well as an empty leather holster.  It appeared that

15   someone who had been involved in the struggle in the master bedroom had gone into Broyles' bedroom

16   and transferred some blood to that location.  The police did not find any live .45 rounds there.[43]

17   The parties stipulated that the 9mm Ruger was registered to Kieren and that the .45 Para-

18   Ordnance was registered to Broyles.[44]

19   The Court can find an explicit reference in the trial testimony to only seven spent shell casings

20   being recovered from inside the house in the general vicinity of the door to the garage.  The State

21   referred to nine casings in its closing, perhaps per the exhibits.  One bullet had gone through the

22   doorknob to the garage door.  One bullet jacket (the usually copper cladding enveloping an otherwise

23

24   [40]#21, Ex. 10, at 78-79 (Bigham).

25   [41]*Id.*, at 79-80.

26   [42]#22, Ex. 13, at 218-30.

27   [43]#21, Ex. 10, at 75-77, 82-85 & 90-91.

28   [44]#22, Ex. 12, at 213.

1   usually lead bullet) was found in the garage.  The detective testified that the jacketing often would

2   become detached when a bullet struck an object.  Two exit holes were found in the garage door after

3   the detectives had it lowered, which potentially would explain why James Hawes heard a round "whiz"

4   by his ear even though the testimony was that the garage door was down when the shots were fired.[45]

5          On the floor of the garage, the police found Broyles' .45 Para-Ordnance handgun, an ammo box

6   with .45 ammunition, and nine unfired .45 cartridges on the floor by the gun.  These items were by the

7   threshold of the inner garage door leading to the house.  The .45 was holstered and unloaded, and there

8   was no magazine either in the weapon or nearby on the floor.  Woods and Telles each testified that they

9   did not see Broyles' .45 or the .45 ammunition in the garage prior to the shooting.  The State postulated

10  during closing that Kieren may have placed the .45 there after the shooting and before the police arrived.

11  The State presented no evidence tending to establish that he did so, however.  If Kieren had done so,

12  he would have been placing a holstered gun in the garage.[46]

13         As noted, the .45 Para-Ordnance was unloaded and there was no magazine nearby when the

14  police investigated the scene.  However, the police found a loaded .45 magazine for the gun in Broyles'

15  denim jacket that apparently also had been dragged out onto the driveway when Woods dragged Broyles

16  out of the garage.  There was no evidence, or suggestion made, that Kieren placed the loaded .45

17  magazine for the Para-Ordnance in Broyles' jacket pocket out in the driveway.[47]

18         The police also found a knife in the garage.  The State maintained that this knife was the knife

19  that was in Woods' hand until after the shooting, at least according to Woods' testimony that he had

20  a knife up to that point.  #21, Ex. 10, at 73 (Bigham); #23, Ex. 14, at 335 (closing).

21

22  [45]#21, Ex. 10, at 70-71 & 74-74 (Bigham); #22, Ex. 12, at 209-10 (Bigham second testimony); *id.*, Ex. 14, at
23  325 (closing argument).  The "bullet" technically is only the projectile that is fired from the gun.  The "casing" or "case"
    is the usually brass shell that holds the primer and into which the bullet is seated during manufacture.  This casing is
24  ejected through a separate port during the firing of each round from a semiautomatic weapon.  A "cartridge" is the
    preassembled unfired combination of the bullet and the casing that is loaded into the gun in preparation for firing.
25  See,e.g., #21, Ex. 10, at 71-72.  Only seven ejected casings specifically were referred to in the transcript (as items L, M,
    N, O, P, Q and S, at 74).

26
    [46]#21, Ex. 10, at 71, 72-73 & 83-92 (Bigham); #22, Ex. 12, at 159-60 & 195-97 (Woods); #21, Ex. 11, at 115-
27  17 (Telles); #22, Ex. 14, at 354 (rebuttal argument).

28         [47]#21, Ex. 10, at 86 & 92 (Bigham).

1       Broyles was hit with a total of seven bullets, five of which were recovered from his body and

2 two of which produced exit wounds.  The medical examiner could not identify with any medical

3 certainty the order in which the bullets struck Broyles.  In no given order, he was struck once in the front

4 left shoulder, twice in the left upper arm passing through into the upper body, once through and through

5 in the left hip, once in the back of the left shoulder over the shoulder blade, once in the back of the right

6 shoulder medial to the shoulder blade, and once through and through in the front of the right thigh.  The

7 bullet that hit the front of the left shoulder and the two that hit initially the left upper arm all created

8 considerable damage to the left lung, diaphragm, liver, stomach and colon.  The two bullets that hit the

9 back left and right shoulder respectively both struck the heart and each one struck a lung.[48]

10       The shots struck the body at "roughly the same time," but the medical examiner was contrasting

11 that measure to longer periods of hours or days.  When asked whether the wound tracks were consistent

12 with Broyles being shot while laying horizontal, the medical examiner responded: "I can't say for sure,

13 but I cannot rule it out.  I would have to say that it is possible."  He acknowledged that there would be

14 other scenarios that would create the wound tracks, stating that "I would not want to get real dogmatic

15 about any one of them."  He testified that there were no powder burns reflecting a contact or close range

16 shot, but he would have to examine the clothing being worn and the characteristics of the weapon and

17 ammunition to provide a definitive opinion in that regard.  The medical examiner's testimony thus did

18 not establish with any degree of medical certainty the sequence of the shots, the time interval between

19 shots, the range from which shots were fired, or the position of Broyles' body when he was struck by

20 any of the various shots.[49]

21       The parties stipulated that the bullets recovered from Broyles' body and the 9 mm casings

22 recovered at the scene came from Kieren's Ruger.[50]

23       The State suggested in closing argument that the fact that all of the 9 mm casings were recovered

24 inside the house rather than in the garage contradicted Kieren's testimony that he had stepped onto the

25 ————————

26   [48]#21, Ex. 10, at 44-49.

27   [49]*Id.*, at 49-50 & 53-54.

28   [50]#22, Ex. 12, at 213.

1   threshold step of the garage before then firing as he backed away from Broyles.[51]  However, the State

2   presented no forensic firearms examiner expert testimony tending to support such an inference.[52]

3          The State further presented no evidence identifying the source of the blood on the gun box for

4   Broyles' .45 Para-Ordnance in his bedroom.  Of course, such evidence would have been inconclusive

5   given that, even if Broyles was the one to retrieve the .45 from the box, he could have transferred

6   Kieren's blood to the box that had been transferred to him during the violent fight.

7          The physical evidence, specifically blood pooling, tended to establish that Broyles was laying

8   on the threshold of the inner garage door leading into the house.[53]  While Woods' testimony has Broyles

9   stepping back before Kieren started firing, both Woods' later testimony and the physical evidence has

10  Broyles in close proximity to the door when he fell.  The neighbor Hawes' recollection that Broyles'

11  body was ten feet from the inside garage door was not supported by the physical evidence.

12         A jailhouse informant, Andrew Rutberg, testified that Kieren said to him that he was claiming

13  self defense "but in effect what happened is he had a fight with someone."  According to Rutberg,

14  Kieren said that someone had bitten his ear off and he chased them out through the garage and shot

15  them.  Kieren stated that he did this "[b]ecause he was angry his ear was bitten off."  During cross, it

16  was revealed that Rutberg had worked either for or with Kieren.  Rutberg denied that Kieren had fired

17  him for impropriety, and he denied that Kieren had aided a criminal investigation against him.  Rutberg

18  previously had written the district attorney's office stating that he did not recall anything.  He stated that

19  he wrote the letter because he did not want to be transported to the county jail again.[54]

20         / / / /

---

[51] #22, Ex. 14, at 325-26.

[52] The Court notes this because a firearm and toolmark examiner generally will not opine as to the specific directionality of ejected casings from a weapon, particularly a weapon that has not been tested as to same, given the wide range of factors that can affect the final location of an ejected casing.  See, e.g., *Barbara A. Pinkston v. Sheryl Foster*, No. 2:07-cv-01305-KJD-LRL, #17, Ex. 36, at 201-02 & 225-27.  If the State were correct that the position of the casings established that Kieren fired all of the rounds from inside the house, then that would tend to undercut Woods' testimony that Kieren fired a second volley of four or five shots from point blank range while Broyles lay on the garage floor.

[53] #21, Ex. 10, at 91-92 (Bigham).

[54] #21, Ex. 11, at 120-27.

Cheryl Ogletree was called by the defense.  Ogletree and Kieren had a child together.  Her testimony began in a disjointed fashion because defense counsel and the witness referred to Broyles when they clearly meant Woods.  Ogletree knew Woods through Kieren.  According to Ogletree, Woods visited her after the shooting shortly after Easter 1996.  Ogletree testified that Woods said to her that "he was going to get Dennis."[55]

Instruction Numbers 7 and 8 stated the entirety of the definition specifically of first degree murder in the instructions to the jury:

> Murder of the First Degree is murder which is perpetrated by any kind of wilful, deliberate, and premeditated killing.
>
> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind.  For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

#22, Ex. 15, Instruction Nos. 7 and 8.  These instructions, again, constituted the entirety of the definition specifically of first degree murder in the jury instructions.  There were no instructions distinguishing "deliberate" from "premeditated."

---

[55]#22, Ex. 13, at 230-35.  After trial, the defense filed a motion for a new trial on the basis of newly discovered evidence.  Ogletree attested in a supporting affidavit: (1) that at the time of trial, she felt hostility toward and a desire for revenge as to Kieren because he had injured their child; (2) that Woods stayed with her for a few days after April 4, 2006; (3) that Woods told her that Kieren had made fun of her and told people that she was unattractive, which increased her anger at Kieren; (4) that Woods told her that Broyles had physically charged Kieren at the time of the shooting, that Broyles had closed the garage door to load his gun, and that Broyles did not intend to leave the property but instead intended to kill Kieren; (5) that Woods told her that it was his intention to see that Kieren was convicted of murder; (6) that Woods stated that he moved Broyles' body from the garage in order to prevent the crime scene evidence from showing self defense by Kieren; (7) that Woods told her that it was her duty to lie at trial to help Woods convict Kieren, because of what he had done to their child; (8) that Ogletree did not tell the defense any of this; and (9) that she had remorse after Kieren was convicted for not coming forward with the truth. #22, Ex. 21.  Petitioner alleged in Ground 1 of the amended petition that he was denied due process when the state district court denied the motion for new trial.  Ground 1 was dismissed as unexhausted following upon the Court's holding that petitioner did not present a federal due process claim in connection with same in the state courts.

The defense objected and requested a charge defining deliberate as a separate element. The state trial court overruled the objection and rejected the defense charge.[56]

The State's closing argument, consistent with the jury instructions given, similarly conflated deliberation and premeditation:

> The word [sic] deliberation comes in is whether it is premeditated or not. And that is the difference between first degree murder and second degree murder.
>
> First degree murder is premeditated murder. Second degree murder is not premeditated murder.
>
> But premeditation again, does not mean that you sit and stew about it, that you planned it out. It can be as instantaneous as two thoughts of the mind.
>
> As one thought follows the other, the premeditation can be at any moment up to or at the time of killing as his Honor has instructed you. That's murder.

#22, Ex. 14, at 309.

The State three times thereafter equated a "spiteful" or "vengeful" murder with a deliberate or premeditated murder.[57]

The Nevada Supreme Court's February 8, 2002, decision on direct appeal summarily rejected the claim now presented in Ground 5, holding that Kieren's claim "that he was denied a fair trial when the jury was not instructed on the element of deliberation in first degree murder . . . lack[s] merit."[58]

### Standard of Review on the Merits

The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011). Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. 131 S.Ct. at 1411. Instead, under 28

---

[56]#22, Ex. 14, at 297-98; *id.*, Ex. 15, Proposed Instruction D-1.

[57]*Id.*, at 312, 324 & 361.

[58]#23, Ex. 51, at 3-4.

1    U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to

2    or involved an unreasonable application of clearly established law as determined by the United States

3    Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence

4    presented at the state court proceeding.  131 S.Ct. at 1398-1401.

5         A state court decision is "contrary to" law clearly established by the Supreme Court only if it

6    applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision

7    confronts a set of facts that are materially indistinguishable from a Supreme Court decision and

8    nevertheless arrives at a different result. *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S.Ct. 7, 10,

9    157 L.Ed.2d 263 (2003).  A state court decision is not contrary to established federal law merely

10   because it does not cite the Supreme Court's opinions.  *Id.*  Indeed, the Supreme Court has held that a

11   state court need not even be aware of its precedents, so long as neither the reasoning nor the result of

12   its decision contradicts them.  *Id.*  Moreover, "[a] federal court may not overrule a state court for simply

13   holding a view different from its own, when the precedent from [the Supreme] Court is, at best,

14   ambiguous."  540 U.S. at 16, 124 S.Ct. at 11.  For, at bottom, a decision that does not conflict with the

15   reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

16        A state court decision constitutes an "unreasonable application" of clearly established federal

17   law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts

18   of the case was not only incorrect but "objectively unreasonable."  *E.g., Mitchell*, 540 U.S. at 18, 124

19   S.Ct. at 12; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

20        To the extent that the state court's factual findings are challenged, the "unreasonable

21   determination of fact" clause of Section 2254(d)(2) controls on federal habeas review.  *E.g., Lambert*

22   *v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004).  This clause requires that the federal courts "must be

23   particularly deferential" to state court factual determinations.  *Id*.  The governing standard is not

24   satisfied by a showing merely that the state court finding was "clearly erroneous."  393 F.3d at 973.

25   Rather,  AEDPA requires substantially more deference:

26              . . . .  [I]n  concluding that a state-court finding is unsupported by
            substantial evidence in the state-court record, it is not enough that we
27          would reverse in similar circumstances if this were an appeal from a
            district court decision. Rather, we must be convinced that an appellate
28          panel, applying the normal standards of appellate review, could not

1    reasonably conclude that the finding is supported by the record.

2  *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

3    Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless

4  rebutted by clear and convincing evidence.

5    The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled

6  to habeas relief.  *Pinholster*, 131 S.Ct. at 1398.

7                                                  ***Discussion***

8    The Court reaches only Ground 5 of the amended petition.

9    In Ground 5, petitioner alleges that he was denied due process in violation of the Fifth and

10  Fourteenth Amendments because the trial court's jury instructions allegedly failed to adequately

11  distinguish between the elements of malice aforethought, premeditation, and deliberation.  Petitioner

12  maintains, *inter alia*, that the premeditation instruction used at his 1999 trial constituted what is referred

13  to under Nevada state practice as a *Kazalyn* instruction, as a substantially similar instruction first

14  appeared in a published decision in *Kazalyn v. State*, 108 Nev. 67, 825 P.2d 578 (1992).[59]  The Supreme

15  Court of Nevada later concluded in *Byford v. State*, 116 Nev. 215, 994 P.2d 700 (2000), prior to

16  Kieren's appeal, that the *Kazalyn* instruction "blur[red] the distinction between first- and second-degree

17  murder" by not sufficiently distinguishing between the distinct elements of deliberation and

18  premeditation.  *See* 116 Nev. at 235, 994 P.2d at 713.  The state supreme court subsequently held,

19  however, during Kieren's direct appeal, that *Byford* did not signify that the giving of the *Kazalyn*

20  instruction violated any constitutional rights, such that the *Byford* holding was not a holding of

21  constitutional dimension that must be retroactively applied.  *Garner v. State*, 116 Nev. 770, 6 P.3d

22  1013, 1025 (2000), *overruled on other grounds by Sharma v. State*, 118 Nev. 648, 56 P.3d 868 (2002).

23  The Ninth Circuit has held, however, that the giving of a *Kazalyn* instruction deprives a defendant of

24  due process, subject to harmless error analysis.  *Polk v. Sandoval*, 503 F.3d 903, 909-11 (9th Cir. 2007).

25    The Supreme Court of Nevada concluded in *Byford* that the *Kazalyn* instruction erroneously

26  "blur[red] the distinction between first- and second-degree murder" by failing to adequately distinguish

27

28    [59]*Compare* #22, Ex. 15, Instruction No. 8, *with Kazalyn*, 108 Nev. at 75, 825 P.2d at 583.

-19-

1    between the distinct elements of deliberation and premeditation required for a conviction for first-
2    degree murder as opposed to lesser homicide offenses.  116 Nev. at 234-36 & n.4, 994 P.2d at 713-14
3    & n.4.  The state supreme court approved a jury instruction in lieu of the *Kazalyn* instruction that
4    expressly and specifically distinguished between the three separate elements of willfulness, deliberation
5    and premeditation.  The instruction approved in *Byford*, *inter alia*, carried forward the concept that
6    premeditation "may be as instantaneous as successive thoughts of the mind."  The instruction further
7    stated, however, that "[a] mere unconsidered and rash impulse is not deliberate, even though it includes
8    the intent to kill."  The approved instruction concluded: "A cold, calculated judgment and decision may
9    be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it
10   includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder
11   of the first degree."  116 Nev. at 236-37, 994 P.2d at 714-15.

12         At Kieren's trial, the state district court gave the *Kazalyn* instruction.  That instruction included
13   no language precluding a conviction for first-degree murder for a killing committed following "a mere
14   unconsidered and rash impulse."  The charge instead instructed the jury that if it believed "that the act
15   constituting the killing has been preceded by and has been the result of premeditation, no matter how
16   rapidly the premeditation is followed by the act constituting the killing, it is wilful, deliberate and
17   premeditated murder."  There were no charges distinguishing the element of deliberation from
18   premeditation.

19         As noted, the Supreme Court of Nevada held during Kieren's appeal that the giving of a *Kazalyn*
20   instruction does not give rise to a federal due process violation.  *Garner, supra.*  The Ninth Circuit has
21   held, however, that the state supreme court's holding rejecting the federal due process claim was
22   contrary to clearly established federal law, based upon controlling United States Supreme Court
23   precedent decided prior to Kieren's trial and appeal.  *See Polk*, 503 F.3d at 909-11.  The role that the
24   *Kazalyn* charge played in the charge as a whole and the exacerbating effect of the State's reliance upon
25   the *Kazalyn* instruction in closing argument make this case virtually indistinguishable from *Polk* in this
26   regard.  *See id.*  This Court of course is bound by the Ninth Circuit's holding that the state supreme
27   court's conclusion that there is no federal due process violation is contrary to clearly established federal
28   law as determined by the United States Supreme Court.

-20-

1    In the answer, respondents do not mention, much less address, *Polk*.  Respondents instead rely

2    upon the 2008 Supreme Court of Nevada decision in *Nika v. State*, 124 Nev. 1272, 198 P.3d 839

3    (2008).  In *Nika*, the Supreme Court of Nevada held that the 2000 *Byford* decision did not reflect a

4    clarification of Nevada law but instead represented a change in Nevada state law that changed the intent

5    element required for first degree murder.  *Nika* held that, accordingly, *Kazalyn* represented a correct

6    statement of Nevada law prior to *Byford*.  The Supreme Court of Nevada sharply disagreed with *Polk*'s

7    analysis of the constitutional issue.  124 Nev. at 1285-87, 198 P.3d at 848-50.  Respondents accordingly

8    urge that the *Kazalyn* instruction represented the correct statement of the law for Kieren's case.

9    To the extent that the Nevada Supreme Court disagrees with *Polk*'s analysis of the constitutional

10   issue in *Nika, supra,* this Court remains bound by the Ninth Circuit's *Polk* decision as to the application

11   of clearly established federal law rather than the constitutional analysis in the Nevada Supreme Court's

12   *Nika* decision.  While the Nevada Supreme Court has sought to recast the *Kazalyn* issue as – in one

13   fashion or another – a purely state law issue in *Garner* and then in *Nika*, the Ninth Circuit to date has

14   been unpersuaded, at least following upon *Garner*.  *See,e.g., Polk*, 503 F.3d at 911 ("Instead of

15   acknowledging the violation of Polk's due process right, the Nevada Supreme Court concluded that

16   giving the *Kazalyn* instruction in cases predating *Byford* did not constitute constitutional error.  In doing

17   so, the Nevada Supreme Court erred by conceiving of the *Kazalyn* instruction issue as purely a matter

18   of state law."); *see also Chambers v. McDaniel*, 549 F.3d 1191, 1190 & n.1 (9th Cir. 2008)(declining

19   to reach respondents' argument that *Polk* was wrongly decided because the subsequent panel was bound

20   by the prior panel opinion in *Polk*).

21   In all events, however, even on its face, *Nika* compels the application of *Byford*, not *Kazalyn*,

22   to Kieren's case:

23              Despite our disagreement with the assumption underlying the
             decision in *Polk*, we acknowledge that the change effected by *Byford*
24           properly applied to that case as a matter of due process.  The United
             States Supreme Court has indicated that for purposes of due process, the
25           relevant consideration "is not just whether the law changed" but also "
             when the law changed."[FN72]  Thus, if the law changed to narrow the
26           scope of a criminal statute before a defendant's conviction became final,
             then due process requires that the change be applied to that
27           defendant.[FN73]  In such cases, retroactivity is not at issue; rather, due
             process requires that the conviction be set aside if required by the change
28           in the law.[FN74]  In this respect, our decision in *Garner* erroneously

-21-

afforded *Byford* complete prospectivity because as a matter of due process, the change effected in *Byford* applies to convictions that were not yet final at the time of the change. *Polk* involved such a conviction. This case, however, does not.

[FN72] *Bunkley v. Florida*, 538 U.S. 835, 841–42, 123 S.Ct. 2020, 155 L.Ed.2d 1046 (2003).

[FN73] *Id.*

[FN74] *Fiore v. White*, 531 U.S. 225, 228–29, 121 S.Ct. 712, 148 L.Ed.2d 629 (2001); *Bunkley*, 538 U.S. at 840–41, 123 S.Ct. 2020.

124 Nev. at 1287, 198 P.3d at 850.

As *Nika* recognizes, "[a] conviction becomes final when the judgment of conviction has been entered, the availability of appeal has been exhausted, and a petition for certiorari to the United States Supreme Court has been denied or the time for such a petition has expired." 124 Nev. at 1284 n.52, 198 P.3d at 848 n.52 (citing prior United States Supreme Court authority).

Kieren's conviction was not final on February 28, 2000, when *Byford* was decided. His judgment of conviction was filed on October 27, 1999, and then a motion for new trial was filed. His notice of appeal was not filed until June 22, 2000, after *Byford*; and his appeal was decided on February 8, 2002. The time for filing a *certiorari* petition thus did not expire until on or about May 9, 2002.[60]

The sole authority relied upon by respondents accordingly compels the conclusion that *Byford* rather than *Kazalyn* should have been applied to Kieren's case under the precedent of the Supreme Court of Nevada. Both *Polk* and *Nika* confirm that Kieren was denied due process because the *Kazalyn* instruction conflating the elements of deliberation and premeditation was given at his trial.

Such a federal due process violation, however, is subject to harmless error analysis. *Polk*, 503 F.3d at 911. A petitioner will be entitled to relief only if "'the error had a substantial and injurious effect or influence in determining the jury's verdict.'" *Polk*, 503 F.3d at 911 (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). If the record leaves the reviewing court in "grave doubt" as to whether the error had such an effect, the petitioner is entitled to relief. *Id.*

---

[60]#22, Ex. 20, #23, Exhs. 44 & 51.

1    For example, in *Polk*, the evidence of deliberation consisted of the following: (1) Polk had

2    threatened and fought with the victim two months before, (2) there was a loud argument shortly before

3    gunshots were heard; and (3) Polk wore a bulletproof vest on the evening of the murder.  The Ninth

4    Circuit concluded that this evidence "was not so great that it precluded a verdict of second-degree

5    murder."  The court noted that prior statements made as a result of agitation or emotional distress do

6    not always connote an intent to actually commit violence, that an argument prior to the homicide

7    actually tended to support a conclusion that the killing was not done with "coolness and reflection," and

8    that donning a bulletproof vest potentially reflected a defensive step as opposed to deliberation to

9    commit murder.  When these competing inferences were coupled with a jury instruction and

10   prosecutorial argument positing that only successive thoughts of the mind were required, the court

11   stated that "we simply cannot conclude that the *Kazalyn* error was harmless."  503 F.3d at 912-13.

12   In the subsequent decision in *Chambers v. McDaniel*, 549 F.3d 1191 (9th Cir. 2008), the Ninth

13   Circuit addressed the issue of harmless error as to a *Kazalyn* error in a case where the State relied upon

14   evidence "that Chambers stabbed Chacon seventeen times; that the wounds penetrated three inches into

15   the body and were located in two separate clusters of wounds; and that Chambers was not mentally

16   disturbed, but at the most merely drunk."  The court concluded that this evidence did "not demonstrate

17   the key feature of the element of deliberation" as the evidence "[i]f anything . . . seems to weigh in

18   favor of second-degree murder committed while in the throes of a heated argument."  The court noted

19   the state supreme court's description of the evidence that "'Chambers murdered the victim in a drunken

20   state, which indicated no advanced planning, during an emotionally charged confrontation in which

21   Chambers was wounded and his professional tools were being ruined.'"  The Ninth Circuit concluded

22   that "'[s]ince we are left 'in grave doubt' about whether the jury would have found deliberation on

23   [Chambers'] part if it had been properly instructed, we conclude that the error had a substantial and

24   injurious effect or influence on the jury's verdict.'"  549 F.3d at 1200-01.

25   In the present case, the trial record similarly gives rise to grave doubt for a reviewing court in

26   considering whether the *Kazalyn* error had a substantial and injurious effect on the jury's verdict.  To

27   be sure, a jury potentially could infer deliberation from the facts presented.  Yet, as in *Polk* and

28   *Chambers*, this evidence did not preclude a verdict of second degree murder.  Under the jury

-23-

1    instructions given and closing arguments made, the jury could have convicted Kieren of first degree
2    murder even if the jurors believed his account that he had formed no plan to kill Broyles prior to the
3    point that he saw him in the garage.  Nor did the evidence presented by the State, if believed by the jury,
4    necessarily preclude a verdict of second degree murder.  The shooting followed almost immediately
5    upon what by all accounts was an extremely violent confrontation during which, *inter alia*, indisputably,
6    Broyles bit off Kieren's right ear.  Similar to *Chambers*, the evidence weighed in favor of a second
7    degree murder committed in connection with a heated and violent confrontation in which the victim
8    literally mutilated the defendant.  While the State's closing sought to equate a "vengeful and spiteful"
9    killing with a premeditated and deliberate killing, that very same immediately reactive vengefulness
10   and spitefulness spoke more to second degree murder than first degree murder.  As in *Chambers*, the
11   Court is left with grave doubt as to whether the jury would have found deliberation on Kieren's part if
12   it had been properly instructed.

13       In this regard, the fact that Kieren fired multiple times is not in and of itself determinative.  The
14   defendant in *Polk* fired multiple times, hitting the victim twice, and the prosecution relied upon the
15   multiple shots to establish the requisite state of mind for first degree murder.  *See* 503 F.3d at 905.
16   And, as noted above, the defendant in *Chambers* stabbed the victim seventeen times with a knife.  In
17   neither case was the fact of multiple shots or knife strikes determinative of the harmless error issue.

18       The *Kazalyn* error accordingly was not harmless error in Kieren's case under the *Brecht*
19   standard.  While a first degree murder verdict by a properly-instructed jury perhaps might have
20   withstood a challenge to the sufficiency of the evidence, that is not the standard for determining
21   harmless error.  Given the highly debatable and hotly contested issue of state of mind in the case and
22   the arguable competing inferences that could be drawn from the evidence relied upon by the State to
23   establish that state of mind, the *Kazalyn* error was not harmless under the *Brecht* standard.

24       The Ninth Circuit has held that the state supreme court's failure to recognize the federal due
25   process error is contrary to clearly established federal law, based upon United States Supreme Court
26   precedent that was on the books at the time of Kieren's trial.  The jury instructions could not eliminate
27   the State's burden of proof on an element that must be proved to establish first degree murder, and the
28   *Kazalyn* instruction did so as to deliberation.  *Polk*, 503 F.3d at 911.

1  For the reasons discussed above, the Court concludes on review of Ground 5 that the use of the

2  *Kazalyn* charge in Kieren's case deprived petitioner of due process of law and did not constitute

3  harmless error.

4  The Court therefore will grant a conditional writ of habeas corpus as further specified below.

5  The Court thus does not reach the remaining claims presented.[61]

6  IT THEREFORE IS ORDERED that the petition for a writ of habeas corpus is conditionally

7  GRANTED and that, accordingly, the state court judgment of conviction hereby is VACATED and

8  petitioner shall be released from custody within thirty (30) days of the later of the conclusion of any

9  proceedings seeking appellate or *certiorari* review of the Court's judgment, if affirmed, or the

10  expiration of the delays for seeking such appeal or review, unless the State files in this matter a written

11  notice of election to retry petitioner within the thirty day period to retry petitioner and thereafter

12  commences jury selection in the retrial within one hundred twenty (120) days following the filing of

13  the notice of election to retry petitioner, subject to request for reasonable modification of the time

14  periods in the judgment by either party pursuant to Rules 59 or 60.

15  The Clerk of Court shall enter final judgment accordingly in favor of petitioner and against

16  respondents, conditionally granting the petition for a writ of habeas corpus as provided above.

17  The Clerk further shall provide a copy of this order and the judgment to the Clerk of the Eighth

18  Judicial District Court, in connection with that court's No. C137463.

19  DATED this 14th day of November, 2011.

20

21

22

23  LARRY R. HICKS
   UNITED STATES DISTRICT JUDGE

24

25  [61]The Court's alternative dispute resolution resources are available to the parties at any time, subject to any
   provisions for same in the Court of Appeals in the event of an appeal.

26

27  If an appeal is taken, the parties may wish to advise the Court of Appeals that at least the following pending
   appeals present potentially related issues: (a) No. 11-16784 (District Court No. 2:05-cv-00061-PMP-RJJ); (b) No. 11-
   15993 (District Court No. 2:07-cv-01305-KJD-LRL); (c) No. 10-17650 (District Court No. 3:07-cv-00290-RCJ-RAM);

28  and (d) No. 11-99004 (death penalty appeal)(District Court No. 3:01-cv-00096-RCJ-VPC). *See also Elliot v. Williams*,
   2011 WL 4436648, No. 2:08-cv-00829-GMN-RJJ (D. Nev., Sept. 23, 2011).