UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| DENNIS K. KIEREN, JR., | Case No. 3:07-cv-00341-LRH-WGC |
| Petitioner, | ORDER |
| v. | |
| STATE OF NEVADA ATTORNEY GENERAL, et al., | |
| Respondents. | |

Dennis K. Kieren, Jr.'s 28 U.S.C. § 2254 habeas petition is before the court for final adjudication on the merits. In 2011, this court conditionally granted habeas relief (ECF No. 44). The court reached only ground 5, in which petitioner alleged that he was denied due process during his jury trial for murder in violation of the Fifth and Fourteenth Amendments because the trial court's jury instructions failed to adequately distinguish between the elements of malice aforethought, premeditation, and deliberation. *Id.* at 19. Judgment was entered (ECF No. 45).

Respondents appealed, and the Ninth Circuit Court of Appeals affirmed this court's decision on March 25, 2014 (ECF Nos. 46, 52). Subsequently, the Ninth Circuit withdrew its memorandum disposition affirming, reversed the grant of habeas relief as to ground 5 in light of an intervening U.S. Supreme Court decision and remanded for consideration of the remaining claims (ECF No. 59). Petitioner and respondents filed supplemental briefing with respect to grounds 2, 6, 7, 8, and 9 (ECF Nos. 71, 76).

///

## I.    Background

The court recounts the background set forth in its previous order that conditionally granted habeas relief on ground 5.

Kieren seeks to set aside his 1999 Nevada state conviction, pursuant to a jury verdict, of first-degree murder with the use of a deadly weapon.  He is serving two consecutive life sentences without the possibility of parole.

Kieren was convicted of the March 7, 1996, murder of David Allan Broyles.  It was undisputed that Kieren shot Broyles multiple times with a 9 mm semiautomatic handgun.  The factual dispute at trial focused upon the circumstances leading up to the shooting and Kieren's state of mind at the time of the shooting.  The State and the defense presented markedly different evidence as to what occurred.  The jury instructions at issue went to the heart of the dispute as to intent, under either account of the event.  The question at trial was not whether Kieren killed Broyles but instead was his state of mind at the critical time, which bore not only on his defense of self-defense but also upon, among other things, the issue of whether he was guilty of second-degree murder rather than first-degree murder.[1]

Dennis Kieren had known David Broyles and Michael Woods, separately, for approximately three years prior to the incident.[2]   Kieren had interacted socially and

---

[1] This court previously conditionally granted habeas relief with respect to the so-called *Kazalyn* instruction on the elements of murder.  The Ninth Circuit reversed in light of intervening U.S. Supreme Court case law that dictated that the Nevada Supreme Court's decision regarding the *Kazalyn* instruction in Kieren's case was not an unreasonable application of clearly established federal law at the time of the decision.

In *Byford v. State*, 994 P.2d 700, 713 (Nev. 2000), the Supreme Court of Nevada concluded that the "*Kazalyn* instruction" "blur[red] the distinction between first- and second-degree murder" by not sufficiently distinguishing between the distinct elements of deliberation and premeditation. In *White v. Woodall*, 134 S.Ct. 1697 (2014) – the United States Supreme Court held that federal courts may extend Supreme Court rulings to new sets of facts on habeas review only if it is "beyond doubt" that the ruling applies to a new set of facts. It is beyond doubt that a ruling applies to a new set of facts only if there can be no "fairminded disagreement" on the question. In *Moore v. Helling*, 763 F.3d 1011, 1021 (9th Cir. 2014), the Ninth Circuit determined that *White v. Woodall* effectively overruled *Babb. v. Lozowsky*, 719 F.3d 1019, 1032-1033 (9th Cir. 2013), and held that, at least before *Bunkley v. Florida* was decided in 2003, it was not an unreasonable application of clearly established federal law not to apply *Byford* to convictions that were not final at the time that *Byford* was decided. Kieren's conviction became final in 2002. Exhs. 51, 53.

[2] The following summary in the text is intended only as an overview of the basic factual particulars of the case in order to provide context for the discussion of the issues.  Any lack of mention of specific evidence

professionally with Broyles and Woods, again separately, in one fashion or another over this time. Broyles and Woods also had known each other for about four years, but each did not know that the other also knew Kieren. Woods and Kieren each had some background, to one extent or another, in fugitive retrieval ("bounty hunting") and/or armed security work.[3]

At the relevant time, Broyles was renting from Kieren and staying at his house. In or around December 1995, Woods returned to Las Vegas from out of state. Woods contacted Kieren, although they had had a falling out a year or so prior to that over money that Kieren allegedly owed Woods. They arranged for Woods to also rent space in Kieren's house, with Woods sleeping on Kieren's sofa.[4]

As of the first part of March 1996, Broyles was planning to move out or was in the process of moving out of Kieren's place. However, as of the date of the incident he was not fully moved out. There was friction at that time over money between Kieren and Woods; and there was friction separately between Kieren and Broyles, for one reason or another.[5]

On the evening of March 6, 1996, Woods and Broyles, who had been working together on a painting job, were in and out of Kieren's house. Kieren was there. Woods

---

in this overview does not signify that the court has overlooked or ignored that evidence in considering a particular issue.

In its summary, the court makes no credibility findings regarding the truth or falsity of statements of fact in the state court. The court summarizes same solely as background to the issues presented in this case. No statement of fact made in describing statements, testimony or other evidence in the state court, whether in this overview or in the discussion of a particular issue, constitutes a finding by this court.

[2] Exhibits 1-77 referenced in this order are found at ECF Nos. 21-24. Exhibits 78-96 are found at ECF Nos. 77, 80, 87.

[3]Exh. 12, pp. 150-159, 189-193 (Woods); exh. 13, pp. 241-244, 277-287 (Kieren).

[4] Exh. 12, pp. 153-156 (Woods); exh. 13, pp. 241-245 (Kieren).

[5] Exh. 12, pp. 156-157, 165-167, 190-195, 204-205 (Woods); exh. 13, pp. 242-245, 291 (Kieren). Woods testified that he also was still living at Kieren's house but was in the process of moving out. Kieren maintained that Woods no longer was living at his house by that time. The distinction is not critical to the resolution of this case.

and Broyles eventually picked up Kristi Telles, who was dating Broyles, after she got off work and headed back to Kieren's house.[6]

After returning to Kieren's house, Woods, Broyles, and Telles sat around in the garage with the garage outer door closed or nearly fully closed, drinking and also smoking some marijuana.[7]

Kieren came into the garage from the house a number of times. He was having words with Broyles about one household complaint or another, such as the three allegedly drinking all of his beer, eating all of his pizza, and not cleaning up after themselves. He would complain about one thing or another and then go back into the house.[8]

At some point, Broyles slipped away into the house without Michael Woods noticing. Woods testified that he "heard something sound like a thump" and noticed that Broyles was no longer in the garage.[9]

Woods went into the house looking for Broyles, either with Telles or followed shortly thereafter by Telles. Inside, the only lights showing were the aquarium lights and the light coming from underneath Kieren's closed master bedroom door. Woods listened through the door but could not hear anything. Woods knocked but got no response. Woods grabbed the doorknob to enter. When Woods was at the door and before he did anything further, Telles went back to the garage.[10]

When Woods opened the bedroom door, he saw the closet sliding doors laying on the floor with glass and blood on the carpet. A trail of blood led into the bathroom. When Woods entered the bathroom, he saw Broyles standing over the clothed Kieren in

---

[6] Exh. 12, pp. 158-163 (Woods); exh. 13, pp. 245-250 (Kieren); exh. 11, pp. 99-103 (Telles).

[7] Exh. 12, pp. 163-164, 192-193, 205-206 (Woods); exh. 13, pp. 246-247, 249-250 (Kieren); exh. 11, pp. 103-105, 112-113 (Telles).

[8] Exh. 12, pp. 164-165, 197-199 (Woods); exh. 13, pp. 250-255 (Kieren); exh. 11, pp. 104, 113 (Telles).

[9] Exh. 12, pp. 167-168, 198-199 (Woods); exh. 11, p. 105 (Telles).

[10] Exh. 12, pp. 168-170, 199-200 (Woods); exh. 11, pp. 106-107, 114-15 (Telles).

4

the empty tub.  According to Woods' testimony, the left-handed Broyles was holding Kieren's ponytail with his right hand and had his left hand over the top of the blade of a knife which was in Kieren's hand.  Kieren kept the knife on the window ledge in the shower.  Although Woods maintained that Kieren's hand was on the handle of the knife, he testified that Broyles had the knife pushed up against the left side of Kieren's face, with his hand over the top of the knife.  Broyles further had his head up against the left side of Kieren's face.[11]

Notwithstanding his testimony that it was Kieren's hand on the handle of the knife, Woods testified that he went up to Broyles and said: "David, what the f___ are you doing?"  Woods acknowledged on cross-examination that he stated to the police in his initial written statement that he thought Broyles was going to kill Kieren when he first saw them in the bathroom.[12]

Broyles then bit Kieren's ear off, pulled it off, and spit it out in the tub.  Kieren let go of the knife, and Broyles took full control of the knife.[13]

Woods testified that Broyles then said to him: "Get the f___ away from me, I will stab you too."[14]

Woods tried to calm Broyles down, defuse the situation, and get the knife from him.  According to Woods, Broyles stated that Woods did not understand, that Kieren had been going for his gun, and that "[n]obody is leaving here alive."  He would not let go of the knife, saying that "no, he was going to kill me."  Woods ultimately was able to get the knife from Broyles, with Broyles asking Woods to hold Kieren down and give him a couple of minutes to get out of the house.  Woods took hold of Kieren's ponytail in

---

[11] Exh. 12, pp. 170-172, 201-03.  *See also* exh. 13, p. 285 (Kieren testimony as to usual location of knife).

[12] *Id.* at 172, 201-202, 206.

[13] *Id.* at 172-173.

[14] *Id.* at 172.

place of Broyles, and Broyles released the knife to him. Broyles then left the bathroom, and Woods heard the bedroom door close behind him.[15]

According to Kieren's testimony, the events that occurred in his room up to that point, including those that occurred prior to Woods arriving, transpired as follows.

According to Kieren, Broyles came into his room, and the two had a tense verbal exchange. Broyles then grabbed him by his hair and struck him repeatedly with his drink glass, while kneeing him and calling him a "punk" and a "bitch." Kieren struggled to break free, and the two men crashed through the closet doors. Broyles continued hitting him with the glass three or four more times until the glass started to shatter. Kieren testified that from this point "it is like a strobe light going on and off" and that "I remember bits and pieces of it." The struggle carried on into the bathroom, where Broyles struck Kieren several times in the head with a cologne bottle until the bottle broke, with Kieren recalling that he could smell the cologne after the bottle broke.[16]

According to Kieren, he fell back into the tub, and Broyles continued to attack him, holding him by the hair and calling him names throughout. Kieren was unable to get any leverage to push his way back out of the tub. Broyles told him that he was going to bite his ear off, and then he did so, spitting Kieren's ear back at him. Broyles then reached up and grabbed Kieren's knife from the window ledge and started thumping him on the head with it. Broyles then "took a hold" of Kieren's nose with his mouth, at which point Woods walked in.[17]

According to Kieren, Woods said to Broyles: "What the f___ are you doing?" Broyles responded that he was sick of Kieren's mouth, that he was done with him, and that he was going to kill Kieren. Woods asked for the knife and then tried to grab Broyles' hand. Broyles jerked his hand away and held the knife up against Kieren's

---

[15] *Id.* at 173-176.

[16] Exh. 13, pp. 255-257.

[17] *Id.* at 257-260.

6

throat.  Kieren held his hands up to protect himself, and the knife would cut his hand every time that Woods tried to grab it.  Similar to Woods' account, Woods ultimately was able to get Broyles to give him the knife, and Broyles asked Woods to hold Kieren down until Broyles left the room.  According to Kieren, Broyles leaned down to him, said "now you are going to die," and ran from the room.[18]

According to Woods' testimony, after Broyles left the room, Kieren immediately tried to get out of the tub.  Woods told him to stay in the tub.  Kieren said: "No, you don't understand, Mike.  He bit my f___in ear off.  I am going to kill him."  Kieren got up out of the tub.  Woods still had the knife that he had obtained from Broyles in his hand.  Kieren pushed past him and said: "I am going to kill him.  He bit my f___ing ear off."  Woods urged Kieren to let the police handle the situation.  Kieren went over to his desk, retrieved his Ruger 9mm handgun, chambered a round, and put the gun to Woods' forehead.  He told Woods, who still had the knife, to get back.[19]

According to Woods, Kieren then exited the bedroom while keeping the gun pointed at him.  He then started "sweeping the hall," meaning that he kept the weapon in front of him sweeping the area in "combat mode" from a military stance.  He did so while keeping an eye on Woods, who kept pace with him about three to four feet away, with the knife still in his hand.  Kieren moved down the hallway, keeping his back to the wall and his weapon in front of him, pointing alternately at Woods and then down the hallway.[20]

Woods testified that Kieren swung open the door to Broyles' bedroom and swept the bedroom with his weapon in combat mode.  He similarly swept the hall bathroom, the living or dining room, and the kitchen.  The dogs were standing at the sliding glass

---

[18] *Id.* at 261-264, 288-289, 292.

[19] Exh. 12, pp. 176-177.

[20] *Id.* at 177-180.

patio door, so it did not appear that anyone had gone that way. Throughout, Kieren would sweep the weapon back to Woods, who still had the knife in his hand.[21]

Woods testified that Kieren then headed for the door to the garage, which opened inward into the house. Woods kept pace with him, three to four feet away, with the knife still in his hand, although he maintained at trial that he did not realize at the time that he still was holding the knife. Woods urged Kieren again to let the police handle the situation and "don't do this." Kieren then swung the door open with his left hand while holding the gun in his right.[22]

According to Woods' testimony, Broyles was standing in the garage reaching for the switch that opened the garage outer door. Kieren raised his weapon, and Broyles stepped back with his arms raised above his head saying "no, don't shoot . . . ." Kieren then fired, with the shots being "real rapid." Woods believed that the first shot hit Broyles in the shoulder, turning him. Another shot hit him in the hip, and he started going down, with the door from the house to the garage swinging shut at the same time. According to Woods, who was inside the house, he was able to tell that Broyles was going to the ground because Kieren's shots were following him to the ground as he kept firing. Kieren kept firing until the door swung closed to about an inch from being fully shut.[23]

Woods testified that Kieren then spun toward him, pointing the gun directly at him again. Kieren then flipped the door open again. Broyles was lying face down on the concrete, with his head laying on the threshold. Woods continued:

> And David was laying down there. He spun down, put the gun down towards him point blank and pulling the trigger. He shot him four or five times.

///

[21] *Id.* at 178-180.

[22] *Id.* at 179-180.
[23] Exh. 12, pp. 180-182.

According to Woods, Kieren went "pow, pow, pow, pow, pow like that" and then turned around and pointed the gun at him again. Woods just stood there. Kieren walked around Woods into the kitchen with the gun pointed on him and called 911.[24]

According to Kristi Telles' testimony, Broyles came back to the garage covered in blood but with no injuries that were apparent to her on that quick view. He said to her: "Get your stuff. Let's get out of here." Kieren of course was inside the house at the time of any such statement. Telles testified that Kieren opened the inside garage door, came into the garage, pointed the gun at them, "and just started firing." Broyles was standing "just a couple of feet" from the door. The outer garage door was closed. Telles testified that Broyles said "no, don't" before Kieren fired. According to Telles, Broyles fell to the ground, Kieren stood there and stared at him "for about a second," and he "then started firing again at him when he was laying down on the ground." Telles ran across the garage trying to get away from the line of fire. She testified that "I guess when he ran out of bullets," Kieren stood there staring at Broyles. Michael Woods then entered the garage.[25]

According to Kieren's testimony, after Broyles left the master bedroom, he tried to get out of the tub a couple of times, but Woods slammed him back down each time. Woods was telling him that he needed to let Broyles cool down and that if he got up, he "would end up dead." Kieren was scared. He did not want to be caught in the tub, because he believed that Broyles would come back. He had heard the home's alarm system beep when Broyles had gone out through the door leading into the garage.[26]

Kieren testified that he ultimately was able to get up, and he then "took off running" and grabbed his handgun. He could hear things being moved in the garage "like the weights," and he knew that Broyles kept some camping gear out there. He

---

[24] *Id.* at 182-183.

[25] Exh. 11, pp. 108-111, 113-115, 117-118.

[26] Exh. 13, pp. 264-266, 285.

assumed that Broyles was going through that gear. At that point, Woods was standing behind Kieren with the knife. Kieren turned and looked at him, and he then took off running. He stated that "I was trying to get distance between" Woods and Broyles. Kieren ran to the garage.[27]

According to Kieren, when he opened the inside garage door, Broyles was by his weight bench digging in his denim jacket and a bag. Kieren stepped into the garage onto the step between the house and garage. Broyles looked up, said "what's up? You want some more?" and started running at him. Broyles was starting to pull something black out of a jacket or a shirt. Kieren knew that Broyles kept several hunting knives in the garage, and he believed that Broyles was pulling a knife "or something." He felt like he was in danger. According to Kieren, Kristi Telles was saying to Broyles: "David, David, don't do it."[28]

Kieren testified that he "just started back pedaling and shooting." He testified that he shot until the door closed, shooting "one through the door or something." He stated that "I could have swore it was like three or four" shots. Kieren maintained that one of the bullets "spun him around like a circle and then I kept firing until the door closed." According to Kieren, he did not see Broyles hit the ground. When either Kieren or Woods opened the door again, Broyles was laying on the floor with his head "real close to the door."[29]

According to Kieren, Woods was saying to him: "What the f___ did you just do?" Woods pushed by him out into the garage. Kieren went to the kitchen and called 911.[30]

According to Woods' testimony, after the shooting, when he went into the garage, he told Telles: "Get the f___ out of the house. No one is leaving here alive." She just

---

[27] *Id.* at 266-269, 286-287.

[28] *Id.* at 267-272.

[29] Exh. 13, pp. 271-274, 289.

[30] Exh. 13, pp. 272-275-4.

stood there. He hit the door switch to the outer garage door "because I couldn't understand why the garage door was still down." Telles still was standing there as the door started going up, perhaps in shock, and he told her again: "Get the f___ out of here now." Telles then turned and ran out of the garage. According to Woods, Kieren pointed the gun at Telles as she was going out under the door. Woods turned around to face Kieren, with the knife still in his hand, and Kieren stepped back and pointed the gun at him.[31]

Telles testified that she ran next door after Woods told her to leave and opened the garage door. According to her testimony, she saw Kieren going in and out of the house as she was running. She rang the neighbor's doorbell frantically. When a woman answered, she told her what happened and asked her to call 911. She stayed at the house thereafter. She had been grazed by a bullet on her left leg.[32]

Woods testified that after Telles left and Kieren had the gun pointed at him, he then pointed it down at Broyles again. Woods thought that Kieren was going to shoot Broyles again. Kieren was saying something on the phone about it being self-defense. Woods, who still had the knife in his hand, said "you lying son-of-a-bitch" and shoved Kieren hard back towards the kitchen. They shoved back and forth, with Kieren saying that it was self-defense and Woods saying, "you didn't have to shoot David like that, you son of a bitch."[33]

Although it would have seemed from Woods' testimony that the above exchange occurred in the garage, Woods testified that he then opened the door, stepped back out into the garage, and grabbed Broyles and turned him over. Broyles was so close to the

---

[31] Exh. 12, pp. 183-184.

[32] Exh. 11, pp. 111-112. The neighbor, Patricia Barbieri, testified that she "heard a couple of pops," "[k]ind of like a cap gun," but she was not sure what it was. Less than a minute later, a young woman was pounding on her door. When she answered the door, the young woman said, "he shot him, he shot him" and asked her to call the police. The young woman thereafter cowered in her hallway, "on the floor curled in a ball." She kept repeating: "He shot him. He shot him." She said that the "he" was "Dennis." Exh. 10, pp. 56-60.

[33] Exh. 12, pp. 184-185.

door that when the inside garage door kept closing back, it would strike Broyles in the head.[34]

Woods testified that it was at this point that he realized that he still had the knife in his hand, and he threw it to the other side of the garage.[35]

After rolling Broyles over, Woods attempted CPR, but there did not appear to be much that Woods could do for him. According to Woods, Broyles "gasped for air and turned his head and gasped again." Kieren looked out again and pointed the weapon at Woods' head and then at Broyles again. Woods grabbed Broyles by the hand and pleaded with him "please, don't die David," stating: "You are not going to die in this f___ing pig's house."[36]

Woods then dragged Broyles out of the garage – away from the scene of the shooting – out onto the driveway.[37]

James Hawes lived three houses west of Kieren's house. He was getting his mail from his box in the neighborhood's cluster mailboxes a couple of homes away from Kieren's house when he heard three gunshots. He testified that one of the shots "whizzed" by his ear. He jumped to the ground, then ran to his house to get his cell phone, and then called 911 while standing behind his jeep. He looked toward Kieren's house, as he believed that he had heard the sound of the shots come from there. By this point, the garage door was open, and a man was standing over a body lying in the garage. Hawes had seen a figure run from the house before that. Hawes then saw Kieren come to the inside garage door, and the man said: "You hunted him down and shot him like a dog, you mother f___er." The man then ran toward Kieren and they began fighting in the door frame to the house. Kieren left and then the man dragged the body out into the street. Hawes testified that he was thirty yards from the house and

---

[34] Exh. 12, p. 185.

[35] *Id.*

[36] *Id.* at 185-186.

[37] *Id.* at 186.

that the body was ten feet from the garage door when the body was inside the garage. He did not see anything on the floor of the garage from his vantage point.[38]

Ronald Allen lived "kitty-corner" from Kieren's house. Allen was awakened by a neighbor knocking on his door and ringing his doorbell. When he went outside after answering the door, he saw a body lying on the ground with a man who he believed to be called "Mike" holding the body. The man appeared to be "very scared, agitated, crying," "real nervous," and "shaking." Allen asked him what happened, and he said: "Dennis shot David. Dennis killed David." Although Allen responded affirmatively that he was awakened by the knocking neighbor, he also testified that he thought that he heard some shots, but he thought that they possibly were coming from a nearby outdoor shooting range.[39]

There was no testimony by any of the neighbor witnesses who testified at trial of hearing specifically multiple gunshots followed by a sustained pause and then more multiple gunshots coming from Kieren's house.

Forensic examination of the scene and physical evidence reflected the following.

Consistent with the testimony as to an extremely violent fight in Kieren's master bedroom, there was apparent human blood throughout the carpet; on top of the papers on the work desk in the office area in the corner; on top of the sliding closet doors that had been knocked down; on the doorway leading into the master bath, as if someone had been bounced into it; smeared over the shower stall, tub area and the window sill; and also on the toilet.[40]

Consistent with Kieren's testimony that Broyles hit him repeatedly in the head with a drink glass during the violent struggle, there were shards of broken glass

---

[38] Exh. 10, pp. 17-27.

[39] *Id.* at 27-35.

[40] Id. at 77-81, 87 (Detective Bigham).

apparently from a drinking glass throughout the master bedroom, even on the bed, intermixed with blood.[41]

Consistent with Kieren's testimony that Broyles hit him repeatedly in the head with a cologne bottle, there were shards of glass in the master bath from an apparent cologne or aftershave bottle with apparent blood mixed in, with the detective testifying that the bottle "really broke apart."[42]

An empty sheath for a knife was found lying on the rug in the master bath.[43]

An empty holster with a magazine with a few cartridges for Kieren's 9mm Ruger was found under the sliding closet doors on the floor.[44]

Kieren was examined at the trauma center at University Medical Center a short time after the incident. Examination reflected that the top third of his right ear had been torn or cut off. He additionally had multiple lacerations on his forehead and scalp, and he had superficial lacerations on his hands from a sharp instrument. The trauma center physician could not provide an opinion at the time of trial -- relying upon his notes rather than an independent recollection of the examination – as to whether or not these injuries were consistent with Kieren having been hit on the head with both a drinking glass and a cologne bottle that shattered and attempting to shield himself from having a knife held up against him.[45]

In Broyles' bedroom, there was blood on the door entering the room. The police found a gun box for a .45 caliber Para-Ordnance semiautomatic handgun, without the gun, laying open on the futon, with a few spatterings of apparent blood on the box, as well as an empty leather holster. It appeared that someone who had been involved in

---

[41] *Id.* at 78.

[42] *Id.* at 87.

[43] Exh. 10, pp. 78-79 (Bigham).

[44] *Id.* at 79-80.

[45] Exh. 13, pp. 218-230.

the struggle in the master bedroom had gone into Broyles' bedroom and transferred some blood to that location. The police did not find any live .45 rounds there.[46]

The parties stipulated that the 9mm Ruger was registered to Kieren and that the .45 Para-Ordnance was registered to Broyles.[47]

The court can find an explicit reference in the trial testimony to only seven spent shell casings being recovered from inside the house in the general vicinity of the door to the garage. The State referred to nine casings in its closing, perhaps per the exhibits. One bullet had gone through the doorknob to the garage door. One bullet jacket (the usually copper cladding enveloping an otherwise usually lead bullet) was found in the garage. The detective testified that the jacketing often would become detached when a bullet struck an object. Two exit holes were found in the garage door after the detectives had it lowered, which potentially would explain why James Hawes heard a round "whiz" by his ear even though the testimony was that the garage door was down when the shots were fired.[48]

On the floor of the garage, the police found Broyles' .45 Para-Ordnance handgun, an ammo box with .45 ammunition, and nine unfired .45 cartridges on the floor by the gun. These items were by the threshold of the inner garage door leading to the house. The .45 was holstered and unloaded, and there was no magazine either in the weapon or nearby on the floor. Woods and Telles each testified that they did not see Broyles' .45 or the .45 ammunition in the garage prior to the shooting. The State postulated during closing that Kieren may have placed the .45 there after the shooting and before the police arrived. The State presented no evidence tending to establish

---

[46] Exh. 10, pp. 75-77, 82-85, 90-91.

[47] Exh. 12, pp. 213.

[48] Exh. 10, pp. 70-71, 74 (Bigham); exh. 12, pp. 209-210 (Bigham second testimony); exh. 14, p. 325 (closing argument). The "bullet" technically is only the projectile that is fired from the gun. The "casing" or "case" is the usually brass shell that holds the primer and into which the bullet is seated during manufacture. This casing is ejected through a separate port during the firing of each round from a semiautomatic weapon. A "cartridge" is the preassembled unfired combination of the bullet and the casing that is loaded into the gun in preparation for firing. *See, e.g.,* exh. 10, pp. 71-72. Only seven ejected casings specifically were referred to in the transcript (as items L, M, N, O, P, Q and S, at 74).

that he did so, however.  If Kieren had done so, he would have been placing a holstered gun in the garage.[49]

As noted, the .45 Para-Ordnance was unloaded and there was no magazine nearby when the police investigated the scene.  However, the police found a loaded .45 magazine for the gun in Broyles' denim jacket that apparently also had been dragged out onto the driveway when Woods dragged Broyles out of the garage.  There was no evidence, or suggestion made, that Kieren placed the loaded .45 magazine for the Para-Ordnance in Broyles' jacket pocket out in the driveway.[50]

The police also found a knife in the garage.  The State maintained that this knife was the knife that was in Woods' hand until after the shooting, at least according to Woods' testimony that he had a knife up to that point.[51]

Broyles was hit with a total of seven bullets, five of which were recovered from his body and two of which produced exit wounds.  The medical examiner could not identify with any medical certainty the order in which the bullets struck Broyles.  In no given order, he was struck once in the front left shoulder, twice in the left upper arm passing through into the upper body, once through and through in the left hip, once in the back of the left shoulder over the shoulder blade, once in the back of the right shoulder medial to the shoulder blade, and once through and through in the front of the right thigh.  The bullet that hit the front of the left shoulder and the two that hit initially the left upper arm all created considerable damage to the left lung, diaphragm, liver, stomach and colon.  The two bullets that hit the back left and right shoulder respectively both struck the heart and each one struck a lung.[52]

---

[49] Exh. 10, pp. 71, 72-73, 83-92 (Bigham); exh. 12, pp. 159-60,195-97 (Woods); exh. 11, pp. 115-17 (Telles); exh. 14, p. 354 (rebuttal argument).

[50] Exh. 10, pp. 86, 92 (Bigham).

[51] Exh. 10, p. 73 (Bigham); Exh. 14, p. 335 (closing).

[52] Exh. 10, pp. 44-49.

The shots struck the body at "roughly the same time," but the medical examiner was contrasting that measure to longer periods of hours or days. When asked whether the wound tracks were consistent with Broyles being shot while laying horizontal, the medical examiner responded: "I can't say for sure, but I cannot rule it out. I would have to say that it is possible." He acknowledged that there would be other scenarios that would create the wound tracks, stating that "I would not want to get real dogmatic about any one of them." He testified that there were no powder burns reflecting a contact or close-range shot, but he would have to examine the clothing being worn and the characteristics of the weapon and ammunition to provide a definitive opinion in that regard. The medical examiner's testimony thus did not establish with any degree of medical certainty the sequence of the shots, the time interval between shots, the range from which shots were fired, or the position of Broyles' body when he was struck by any of the various shots.[53]

The parties stipulated that the bullets recovered from Broyles' body and the 9 mm casings recovered at the scene came from Kieren's Ruger.[54]

The State suggested in closing argument that the fact that all of the 9 mm casings were recovered inside the house rather than in the garage contradicted Kieren's testimony that he had stepped onto the threshold step of the garage before then firing as he backed away from Broyles.[55] However, the State presented no forensic firearms examiner expert testimony tending to support such an inference.[56]

---

[53] *Id.* at 49-50, 53-54.

[54] Exh. 12, pp. 213.

[55] Exh. 14, pp. 325-326.

[56] The court notes this because a firearm and toolmark examiner generally will not opine as to the specific directionality of ejected casings from a weapon, particularly a weapon that has not been tested as to same, given the wide range of factors that can affect the final location of an ejected casing. *See, e.g.*, *Barbara A. Pinkston v. Sheryl Foster*, No. 2:07-cv-01305-KJD-LRL, ECF No. 17, exh. 36, pp. 201-02, 225-27. If the State were correct that the position of the casings established that Kieren fired all of the rounds from inside the house, then that would tend to undercut Woods' testimony that Kieren fired a second volley of four or five shots from point blank range while Broyles lay on the garage floor.

The State further presented no evidence identifying the source of the blood on the gun box for Broyles' .45 Para-Ordnance in his bedroom. Of course, such evidence would have been inconclusive given that, even if Broyles was the one to retrieve the .45 from the box, he could have transferred Kieren's blood to the box that had been transferred to him during the violent fight.

The physical evidence, specifically blood pooling, tended to establish that Broyles was lying on the threshold of the inner garage door leading into the house.[57] While Woods' testimony has Broyles stepping back before Kieren started firing, both Woods' later testimony and the physical evidence has Broyles in close proximity to the door when he fell. The neighbor Hawes' recollection that Broyles' body was ten feet from the inside garage door was not supported by the physical evidence.

A jailhouse informant, Andrew Rutberg, testified that Kieren said to him that he was claiming self-defense "but in effect what happened is he had a fight with someone." According to Rutberg, Kieren said that someone had bitten his ear off, and he chased them out through the garage and shot them. Kieren stated that he did this "[b]ecause he was angry his ear was bitten off." During cross, it was revealed that Rutberg had worked either for or with Kieren. Rutberg denied that Kieren had fired him for impropriety, and he denied that Kieren had aided a criminal investigation against him. Rutberg previously had written the district attorney's office stating that he did not recall anything. He stated that he wrote the letter because he did not want to be transported to the county jail again.[58]

Cheryl Ogletree was called by the defense. Ogletree and Kieren had a child together. Her testimony began in a disjointed fashion because defense counsel and the witness referred to Broyles when they clearly meant Woods. Ogletree knew Woods through Kieren. According to Ogletree, Woods visited her after the shooting shortly

---

[57] Exh. 10, pp. 91-92 (Bigham).

[58] Exh. 11, pp. 120-127.

after Easter 1996.  Ogletree testified that Woods said to her that "he was going to get Dennis."[59]

## II.    Antiterrorism and Effective Death Penalty Act

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act (AEDPA), provides the legal standards for this court's consideration of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). This Court's ability to grant a writ is limited to cases where "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the

---

[59] Exh. 13, pp. 230-35.  After trial, the defense filed a motion for a new trial on the basis of newly discovered evidence.  Ogletree attested in a supporting affidavit: (1) that at the time of trial, she felt hostility toward and a desire for revenge as to Kieren because he had injured their child; (2) that Woods stayed with her for a few days after April 4, 2006; (3) that Woods told her that Kieren had made fun of her and told people that she was unattractive, which increased her anger at Kieren; (4) that Woods told her that Broyles had physically charged Kieren at the time of the shooting, that Broyles had closed the garage door to load his gun, and that Broyles did not intend to leave the property but instead intended to kill Kieren; (5) that Woods told her that it was his intention to see that Kieren was convicted of murder; (6) that Woods stated that he moved Broyles' body from the garage in order to prevent the crime scene evidence from showing self-defense by Kieren; (7) that Woods told her that it was her duty to lie at trial to help Woods convict Kieren, because of what he had done to their child; (8) that Ogletree did not tell the defense any of this; and (9) that she had remorse after Kieren was convicted for not coming forward with the truth. Ex. 21.  Petitioner alleged in Ground 1 of the amended petition that he was denied due process when the state district court denied the motion for new trial.  Ground 1 was dismissed as unexhausted following upon the court's holding that petitioner did not present a federal due process claim in connection with same in the state courts.

state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694.

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir.2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

.... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

### III.   Instant Petition

#### a.  Claims raised on direct appeal

##### i.  Ground 2

Kieren contends that two of the self-defense jury instructions given were confusing and improperly shifted the State's burden of proof, in violation of his Fifth and Fourteenth Amendment due process rights (ECF No. 20, pp. 14-15).

To obtain relief based on an error in instructing the jury, a habeas petitioner must show the "'instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Where the defect is the failure to give an instruction, the inquiry is the same, but the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law.  *See Henderson v. Kibbe*, 431 U.S. 145, 155-157 (1977); *see also Estelle*, 502 U.S. at 72.

The jury was instructed regarding self defense:

Homicide is justifiable when committed by a person in the lawful defense of oneself when he has reasonable ground to apprehend that he is in danger of great bodily injury or death and that there is imminent danger of such a design being accomplished and that the killing of the other was absolutely necessary.

A bare fear that the person is in danger of great bodily injury or death is insufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the person killing really acted under the influence of those fears and not in the spirit of revenge.

Exh. 15, jury instruction No. 23.

The jury was also instructed:

Actual danger is not necessary to justify self defense. If one is confronted by the appearance of danger which arouses in his mind, as a reasonable person, an honest conviction and fear that he is about to suffer great bodily injury, and if a reasonable man in a like situation, seeing and knowing the same facts, would be justified in believing himself in like danger, and if the person so confronted acts in self defense upon such appearances and from such fear and honest convictions, his right of self defense is the same whether such danger is real or apparent.

The law does not justify the use of a greater degree of force than is reasonably necessary and the burden is on the State to prove beyond reasonable doubt that the degree of force used was greater than reasonably necessary.

Exh. 15, jury instruction No. 30.

The Nevada Supreme Court rejected this claim on direct appeal:

Kieren argues that the district court committed reversible error by giving self defense jury instructions that were confusing, ambiguous, and which both shifted and reduced the State's burden of proof. We disagree. We conclude that this argument lacks merit because Kieren did not object to the instructions during trial and we find that there was no plain error affecting substantial rights belonging to Kieren.

Exh. 51, p. 3. Respondents point out that 8 jury instructions were give on self defense. Exh. 15, jury instruction nos. 23-30. Instruction No. 28 also stated that, because Kieren offered evidence of self defense, the burden was on the State to prove beyond a reasonable doubt that the alleged justification for self defense did not exist. Taken as a whole, and particularly in light of instruction no. 28, this court does not view the self defense instructions as improperly shifting the burden of proof. Kieren has not demonstrated that the Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented

in the state court proceeding. 28 U.S.C. § 2254(d). Accordingly, federal habeas relief is denied as to ground 2.

### ii. Ground 6

Kieren claims that the jury was improperly instructed on reasonable doubt, in violation of his Fifth and Fourteenth Amendment due process rights (ECF No. 20, pp. 19).

The jury instruction on reasonable doubt set forth the Nevada statutory definition:[60]

> A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.

Exh. 15, jury instruction no. 32.

The Nevada Supreme Court ruled that this claim lacked merit. Exh. 51, pp. 3-4.

Kieren acknowledges that the Ninth Circuit Court of Appeals has upheld the Nevada reasonable doubt instruction at issue. *Ramirez v. Hatcher*, 136 F.3d 1209, 1214-1215 (9th Cir. 1998). Kieren thus has not shown that the Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Ground 6 is denied.

### iii. Ground 9

Kieren contends that the State failed to disclose exculpatory evidence in violation of his Fifth, Eighth, and Fourteenth Amendment rights to due process, equal protection, and a reliable sentence (ECF No. 20, pp. 26-27).

The State has a duty to turn over evidence that is favorable to the defense. *See Strickler v. Green*, 527 U.S. 263, 280 (1999). The State violates due process if it fails to

---

[60] NRS 175.211.

turn over evidence that is "favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued, [that is, it must have been reasonably probable that the outcome of trial would have been different if the suppressed evidence had been disclosed to the defense]." *Id.* at 281-82; 289. If the evidence has no impeachment or exculpatory value it is not *Brady* material. *Brady v. Maryland*, 373 U.S. 83 (1963); *Morris v. Ylst*, 447 F.3d 735, 740-742 (9th Cir. 2006).

Kieren alleges that in a taped statement to someone in the district attorney's office, Woods stated that Broyles had bragged to him about committing murders in California (ECF No. 20, pp. 26-27; *see also* exh. 29). At the time the defense sought the tape in 2000, the State was unable to locate to original tape recording from 1997. Kieren claims there is a missing portion of the interview that would have enabled the defense to impeach Woods' trial testimony that Broyles was nonviolent (ECF No. 20, pp. 26-27).

Respondents point out that the State gave the defense a copy of the transcript, which references Broyles telling Woods about having to kill someone in California. *See* exh. 31. Thus, Kieren actually had the information.

The Nevada Supreme Court affirmed the denial of this claim in his postconviction proceedings:

> Kieren also argues that the district court erred by denying his claim that the State violated *Brady v. Maryland* by losing, destroying, or concealing exculpatory evidence, specifically the final portion of the tape of Michael Woods' police interview. Woods allegedly told police in this interview that the victim had bragged to him about committing murders in California. Kieren argues that this evidence would have enabled him to impeach Woods' testimony that the victim was nonviolent. However, Kieren fails to cite to any part of the record where Woods so testified, and our review of the record does not reveal any such testimony. In fact, Woods testified that he saw the victim bite off part of Kieren's ear and that when he found Kieren and the victim in the bathroom he was afraid the victim would kill Kieren. Thus, the district court did not err in denying this claim.

Exh. 73, pp. 3-4.

In his federal petition Kieren again has not pointed to where in Woods' trial testimony he states that Broyles was nonviolent. As set forth at the outset of this order, the evidence adduced at trial was that Broyles bit off a portion of Kieren's ear and threatened to kill Woods. Ground 9 lacks merit. Kieren has not shown that the Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Ground 9 is denied.

#### iv. Ground 7

Kieren asserts that the cumulative effect of trial errors violated his Fifth and Fourteenth Amendment due process and fair trial rights (ECF No. 20, p. 20).

The cumulative effect of multiple errors can violate due process and warrant habeas relief where the errors have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007).

The Nevada Supreme Court ruled that this claim lacked merit. Exh. 51, pp. 3-4. As Kieren has not demonstrated that any alleged trial errors violated his constitutional rights and has not shown that the Nevada Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Relief is denied as to ground 7.

#### b. Ineffective assistance of counsel claims

Kieren contends that trial and appellate counsel rendered ineffective assistance. Ineffective assistance of counsel (IAC) claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was

not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id.* To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.* Additionally, any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689. It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id.*

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an objective standard of reasonableness, . . . under prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations omitted). When the ineffective assistance of counsel claim is based on a challenge to a guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.*

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential."

*Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* at 1403 (internal citations omitted). Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 181-84. The United States Supreme Court has specifically reaffirmed the extensive deference owed to a state court's decision regarding claims of ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S. at ——, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S. at ——, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (internal quotations and citations omitted).

### i. Ground 8(a)

Kieren argues that counsel failed to properly present evidence establishing his state of mind, specifically with respect to an alleged San Bernadino murder committed by the victim as well as two bar fights (ECF No. 20, pp. 21-24).

Kieren testified at the evidentiary hearing on his state postconviction petition that Broyles had mentioned more than once that he had "killed two dudes" in San

Bernadino. Exh. 64, pp. 59-98. Kieren stated that Broyles showed him a Polaroid of Broyles standing in a ditch and holding a shovel and a skull. He testified that he had witnessed one bar fight in which Broyles seriously injured someone, and he was in a bar during another incident when Broyles allegedly seriously injured someone in the restroom. He stated that he had asked his defense counsel to look into the matters.

Defense counsel testified that he did not recall introducing any evidence about a San Bernadino incident but that he would have done so if it had been pertinent. *Id.* at 11.

At the close of the hearing, the court explained that it was unpersuaded:

> Let's look at what Mr. Kieren testified to today. Let's look at these alleged bar fights. One he allegedly witnesses himself, and then had nothing to do with the guy. He had so much nothing to do with him that he let the guy come live with him six months, a year later, took him in, had him living in his house for months before this incident.

> The other incident he doesn't have any personal knowledge of all. All he knows is that his buddy left, went to the bathroom and sometime later a bunch of guys hustled his buddy out of the bathroom and then the ambulance was called. That's firsthand knowledge of nothing.

> So, the deal down in San Bernardino is a big nothing. It's a wild goose chase. It was a total waste of everyone's time to get these reports. Whatever we, the taxpayers paid, to have Mr. Schieck's investigator go get that report is a big nothing. . . .

> Your client didn't believe him the first time he told him. He didn't believe him the second time. The uncle [Raymond Kieren] didn't believe him. It was just hot air. Perhaps Mr. Broyles [the victim] is just a man who's full of hot air

> . …if your client was truly afraid of him, that would have been the first thing that he said when he called on 911. That would have been when he told the police he was scared to death of this guy, and that he had to shoot him in self-defense, and he certainly would have said that when he testified on cross-examination instead of telling the jury what he told them.

> . . . And even if it turns out that your attorney didn't run down this California incident to the depth and extent that Mr. Reifer did, it's a big so what. It's nothing. It would not have helped you. It would not have helped you at trial, and it would not have resulted in a different trial result. And the reason I say that is because the jury has to take a look at what your thought process was and what you – and that's best determined by what you did right after it, within 24 to 48 hours after this event. And not once in that 24 to 48-hour period did you tell anybody that you were scared to death of this guy and that that's why you wanted him out of your house.

> And when you came to this decision that you were scared to death of the guy and when you believed all this stuff, it's simply not there, and

28

because it's not there it would appear that it's simply a defense created months or years after the event to try to give yourself a better shot at defending a murder trial.

*Id.* at 112-18.

Consistent with her findings at the evidentiary hearing, the state district court denied Kieren's claim of ineffective assistance of counsel. The Nevada Supreme Court affirmed the decision noting Kieren failed to demonstrate prejudice pursuant to *Strickland*.

> The testimony established that the victim was the initial aggressor, that he bit off a portion of Kieren's ear, and that he threatened to stab a witness, Michael Woods, who tried to break up the incident. However, the jury also heard testimony that the victim gave Woods the knife he was holding and asked Woods to restrain Kieren while he left. Woods then took the knife and restrained Kieren; Kieren told Woods, 'You don't understand, Mike, he bit my [f—ing] ear off, I am going to kill him.' Kieren got away from Woods, retrieved a pistol from his bag, and went to the garage, where he found the victim and pointed the gun at him. The victim said 'No, don't.' Kieren shot the victim several times and then stood over him and shot him again. The victim had a total of seven gunshot wounds. Kieren testified that he was mad at the victim before the killing. Accordingly, we conclude the district court did not err in denying this claim.

Exh. 73, pp. 2-3.

Kieren's testimony about Broyles' alleged prior violent behavior lacks credibility. But even assuming that Kieren feared Broyles, the jury heard the testimony of Kieren, Woods, and Broyles' girlfriend Telles, as well as the forensic evidence.  It cannot be said that Kieren has demonstrated that the Nevada Supreme Court's decision affirming the denial of this claim was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).  Ground 8(a) is denied.

### ii. **Ground 8(b)**

Kieren claims trial counsel IAC for failing to call an expert to testify regarding the effects of Kieren's injuries sustained when the victim attacked him (ECF No. 20, pp. 25-26).

///

///

Trial counsel Peter LaPorta testified at the postconviction evidentiary hearing.  Exh. 64, pp. 9-38.  He stated that he did not call an expert to testify about the effects that Kieren's injuries would have had on him because Kieren

> was adamant it was self defense.  He never expressed to me or demonstrated to me that he had any diminished capacity, mental capacity, at that point in time.  He seemed to be very in control on what he was relating to me, and as a result I was not going to present competing defenses to a jury.

*Id.* at 16.

The Nevada Supreme Court affirmed the denial of this claim, reasoning:

> At the evidentiary hearing, counsel testified that he decided such evidence would not be helpful because it could "compete with" the self-defense theory.  Counsel's tactical decisions are "'virtually unchallengeable absent extraordinary circumstances,'" which we do not perceive here.  Thus, the district court did not err in denying this claim.

Exh. 73, p. 3. Kieren has not shown that the Nevada Supreme Court's decision affirming the denial of this claim was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d). Federal habeas relief is denied as to ground 8(c).

### iii. Ground 8(c)

Kieren asserts that his trial counsel was ineffective for failing to fully examine Cheryl Ogletree regarding her knowledge of Woods, Broyles, and the case (ECF No. 20, p. 6).

Ogletree testified briefly at trial, stating that she and Kieren had a child together. Exh. 13, pp. 231-235.  She stated that after the killing, Woods came to see her and during their conversation Woods said that "he was going to get Dennis [Kieren].  He was going to make sure that -- . . . . He was going to get Dennis." *Id.* at 234-235.

In closing, Kieren's attorney invoked that testimony to try to discredit the State's witnesses: "Now, their testimony is their feeble and pathetic attempt to make good on Mr. Woods threat he made to Ms. Ogletree 'I am going to get Dennis.'" *Id.* at 342.

Kieren was specifically given the opportunity to develop this claim at the state postconviction hearing; however, he failed to do so:

> THE COURT: Now another thing that I said we were going to talk about today, which I didn't hear anything at all about, was Ogletree, the lady…. Now, she was called as a defense witness, and he's complaining about a witness that he called at trial?

> MR ORAM: Yes, Your Honor, and she was here today. I spoke with her and made the determination that we would be better suited without her.

Exh. 64, p. 116.

Rejecting this claim, the Nevada Supreme Court observed that Kieren provided no legal support or cogent argument and failed to demonstrate a reasonable probability of a different outcome. Exh. 73, p. 4.

This court concludes that the record belies Kieren's IAC claim. Defense counsel examined Ogletree and presented the defense theory that Woods lied to get Kieren convicted. Kieren has not demonstrated that the Nevada Supreme Court's decision affirming the denial of this claim was contrary to, or involved an unreasonable application of, *Strickland*, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The court accordingly denies federal ground 8(c).

The petition, therefore, is denied in its entirety.

## IV.    Certificate of Appealability

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists

would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id*.

Having reviewed its determinations and rulings in adjudicating Kieren's petition, the court finds that none of those rulings meets the *Slack* standard.  The court therefore declines to issue a certificate of appealability for its resolution of any of Kieren's claims.

## V.  Conclusion

**IT IS THEREFORE ORDERED** that the amended petition (ECF No. 20) is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly and close this case.

DATED this 27th day of September, 2019.

_____
LARRY H. HICKS
UNITED STATES DISTRICT JUDGE